UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

KHIRY JAMAL GATES,

        Plaintiff,

v.

        Case No. 19-cv-1525-pp

EUTECTIC CASTOLIN,
and JOHNNY DANIELS,

        Defendants.

---

**ORDER SCREENING AND ALLOWING PLAINTIFF TO PROCEED ON AMENDED COMPLAINT (DKT. NO. 10) AND DENYING AS MOOT PLAINTIFF'S MOTION TO EXTEND TIME TO SERVE ORIGINAL COMPLAINT (DKT. NO. 9)**

---

On March 4, 2020, the plaintiff, representing himself, filed this amended complaint in response to the court's February 2020 screening order (Dkt. No. 8). Dkt. No. 10. The plaintiff is suing his former employer, Eutectic Castolin,[1] and his former supervisor, Johnny Daniels, for alleged race discrimination. Dkt. No. 10. This order screens the amended complaint under 28 U.S.C. §1915 and rules on the plaintiff's motion for an extension of time to serve the original complaint (dkt. no. 9).

**I.    Screening Standard**

The court must decide whether the plaintiff has raised claims that are legally "frivolous or malicious," that fail to state a claim upon which relief may be granted, or that seek monetary relief from a defendant who is immune from

---

[1] The company web site refers to the company as "Castolin Eutectic." https://www.castolin.com/en-US.

1

such relief. 28 U.S.C. §1915A(b). To state a claim under the federal notice pleading system, a plaintiff must provide a "short and plain statement of the claim" showing that he is entitled to relief. Fed. R. Civ. P. 8(a)(2). A plaintiff does not need to plead every fact that supports his claims; he needs only to give the defendants fair notice of the claim and the grounds upon which it rests. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)). At the same time, the allegations "must be enough to raise a right to relief above the speculative level." Id. Because the plaintiff is representing himself, the court must liberally construe the allegations of his complaint. Erickson v. Pardus, 551 U.S. 89, 94 (2007).

## II.   Facts Alleged in the Amended Complaint

The court noted in its order dismissing the original complaint that while the plaintiff appeared to be alleging race discrimination, he did not state what his race was. Dkt. No. 8 at 3. In the amended complaint, he still does not directly identify his race. From some of his allegations, however, the court infers that the defendant is Black.

The amended complaint alleges that defendant Daniels became the plaintiff's supervisor in the department where the plaintiff was assigned. Dkt. No. 10 at 1. The plaintiff says he began to hear from coworkers that "Daniels was biased towards his own ethnicity and degrades women on the regular in his supervisory position." Id. The plaintiff alleges that because he "had such a great interview" with Daniels and because he is a fair person, he overlooked the "warning signs" his coworkers were sending him. Id.

The plaintiff asserts that as time went on and he progressed in the job, he heard more rumors. He says, however, that he still paid them no mind. Id. A few times, "due to an unforeseen event," the plaintiff was late. Id. He says that he reached out to his supervisor, as the corporate handbook required. Id. The plaintiff says it was at this point that Daniels began to harass him, using profanity and acting unprofessionally. Id. He says that he noticed that Daniels was waiting for the plaintiff at the clock every day, asking the plaintiff why he did not punch out for lunch and why he was punching in and out during breaks; the plaintiff says that "[r]udeness is not the word that could describe [Daniels'] actions towards [the plaintiff]." Id.

The plaintiff alleges that no one at the company was required to punch in and out for lunch or breaks, but it was what the plaintiff was trained to do. Id. Daniels told the plaintiff that Daniels "will now update this and handle this during the next safety meeting." Id. The plaintiff says that Daniels started pulling him aside, taking up company time and becoming "more belligerent for no reason about [the plaintiff] punching in and out of the clock." Id. The plaintiff did as he was told because he needed the job. Id. The plaintiff says Daniels then began monitoring the plaintiff's movements at the time clock; Daniels wasn't doing this to other employees. Id. When the plaintiff pointed out that other employees weren't punching in or out for lunch, Daniels "became very argumentative with" the plaintiff, even saying he would pull the logs of other employees just to prove a point. Id. Daniels made the comment, "keep it

3

up," which the plaintiff construed as a threat that if the plaintiff kept pointing out issues, he would be fired. Id. at 1-2.

The plaintiff says that he was doing very well at work, being praised by the CEO and given recognition as an outstanding performer. Id. at 2. But the more the plaintiff was recognized for doing well, the more difficult Daniels became to deal with. Id. The plaintiff says his co-workers noticed a change in him, and when he told them about things Daniels had done, they responded with similar stories. Id. The plaintiff relates things he has heard about Daniels' history of harassment. Id.

The plaintiff explains that "during all the chaos" he "became incarcerated . . . for disorderly conduct." Id. He missed two days of work (although the charges later were dropped). The plaintiff says when he got back to work, he was honest with Daniels; he says that while Daniels was sympathetic at first, when the plaintiff asked Daniels to keep the situation confidential, Daniels "began getting loud and using obscene language." Id. He says Daniels told his co-workers about the plaintiff's situation, asking them what they would do in a similar situation. Id. He alleges that Daniels pulled him aside and said that the "bitch" lied about the plaintiff, and said that he bet the defendant was going to go back and live with the woman "because you are stupid . . . [j]ust like every young nigga you age." Id.

The plaintiff says that at that point, he had had enough. Id. He told his supervisor (presumably Daniels) that the plaintiff was going to start recording him, and begged him to stop harassing the plaintiff, coming to the plaintiff's

4

department while the plaintiff was working and saying, "You black mother fuckers ain't gone never be shit ya'll would never make it and be successful like me." Id. The plaintiff says that Daniels said that he tried to look after "his people" and to hire them but that they "end up showing up late every day or they not productive or they just don't show up at all. But that's what happens when I give a nigga an inch and he takes a mile." Id. Daniels told the plaintiff that he knew people at the EEOC and the federal courthouse who would "pull some strings," that the plaintiff would not get far with this lawsuit and that other employees had tried, unsuccessfully, to sue. Id.

Because the plaintiff needed the job, he decided to just keep his distance from Daniels. Id. at 2-3. But the plaintiff could not avoid Daniels because Daniels would come into the department and pick arguments with the plaintiff. Id. at 3. The plaintiff says that he has seen how Daniels treats other employees, and that employees are intimidated by him. Id. He says that one day, the plaintiff's paycheck was given to another employee by the front desk receptionist, and the plaintiff didn't learn about it until he asked Daniels, who told him that the "dumb bitch" at the front desk gave it to another employee," but that the plaintiff should not get involved because Daniels would handle it. Id.

The mix-up happened on another payday, but this time, Daniels was out of the office, so the plaintiff talked to the receptionist himself. Id. When Daniels returned, Daniels gave the plaintiff the check but accused the plaintiff of "bitchin." Id. When the plaintiff said that all he did was ask about his check

5

and that Daniels should speak to him more professionally, Daniels responded, "You a pussy footing ass nigga." Id. As the plaintiff tried to explain why he'd gone to the receptionist himself, Daniels became irate and started calling the plaintiff a "[s]imple ass nigga." Id. The plaintiff says that Daniels was upset because he had told the plaintiff that Daniels had everything under control and that the plaintiff "didn't need to put these white folks further in [Daniels'] business." Id. Daniels told the plaintiff that he trusted the plaintiff and didn't second-guess him when he came late to work and gave Daniels one of his "bullshit lame ass excuses," but that if Daniels told the plaintiff something was under control the plaintiff went behind his back "asking these white mother fuckers and shit." Id. In the face of this, the plaintiff asked Daniels if he could go home for the day. Id. Daniels responded that that would be best, before Daniels forgot where he was and did "something" to the plaintiff. Id. The plaintiff took this as a threat that Daniels might forget his position and do the plaintiff harm. Id.

The plaintiff kept showing up for work. Id. Daniels continued to come into the plaintiff's department and argue with him, and the plaintiff learned that Daniels was telling other employees about the plaintiff's criminal record and telling them the plaintiff never would be hired permanently; Daniels said that the company was going to use the plaintiff to get through peak season and then fire him. Id. At one point, the plaintiff overheard Daniels telling another employee that people with the plaintiff's criminal record needed to die, that there was no place on earth for people like the plaintiff and that if Daniels had

6

checked the plaintiff's criminal record prior to hire he would have "passed" on the plaintiff. Id.

The plaintiff informed Daniels that he would be filing a harassment lawsuit against Daniels and the company, since he had complained to human resources and the CEO and nothing had been done. Id. The next day, Daniels called the plaintiff into his office and said, "I don't need yo ass here no more." Id. Daniels told the plaintiff to get off the premises before he called the police to "escort [the plaintiff's] black ass off the premises." Id. The plaintiff says that when he asked why Daniels would do this, Daniels responded that he was going to fire the plaintiff before the plaintiff could sue. Id. The plaintiff says that Daniels responded that he had "these white folks money in [his] pockets," that he was the man around the company and that all other cases had been dismissed. Id. That was the plaintiff's last day at Eutectic. Id.

The plaintiff says there were many other harassing incidents that he hasn't described. Id. He says that his position at the company required a hazmat suit, and that he was in the process of being fitted for one when Daniels fired him. Id. The plaintiff says that he never had a job that treated him this badly. Id.

### III. Analysis

The plaintiff has named Johnny Daniels and Eutectic Castolin as defendants. He has not cited any statutes that he believes the defendants have violated, but because he is representing himself, the court has considered possible causes of action.

Title VII of the Civil Rights Act of 1964 says that "an employer may not discriminate based on 'race, color, religion, sex, or national origin.'" Abrego v. Wilkie, 907 F.3d 1004, 1012 (7th Cir. 2018) (quoting 42 U.S.C. §2000e-2(a)). Title VII provides a cause of action against an employer, not an individual supervisor. Williams v. Banning, 72 F.3d 552, 555 (7th Cir. 1995). Title 42 United States Code §1981 "guarantees equal rights to all citizens regardless of race and in the context of employment provides that all people have the 'same right . . . to make and enforce contracts . . . as is enjoyed by white citizens.' 41 U.S.C. § 1981(a)." Morris v. BNSF Railway Co., 969 F.3d 752 (7th Cir. 2020). "[B]oth statutes 'have the same liability standards.'" Id. (quoting Walker v. Abbott Labs., 340 F.3d 471, 474 (7th Cir. 2003)). See also, Yancick v. Hanna Steel Corp., 653 F.3d 532, 544 (7th Cir. 2011). The plaintiff's allegations sound like claims of hostile work environment and retaliation, both of which are prohibited by Title VII and §1981. Huri v. Office of the Chief Judge of the Circuit Court of Cook Cty., 804 F.3d 826, 833 (7th Cir. 2015).[2]

A.   Hostile Work Environment

"To state a Title VII hostile work environment claim, a plaintiff must allege (1) [he] was subject to unwelcome harassment; (2) the harassment was based on [his race]; (3) the harassment was severe or pervasive so as to alter the conditions of employment and create a hostile or abusive working

---

[2] The plaintiff has exhausted his administrative remedies; he attached his EEOC "Notice of Right to Sue" letter to his original complaint. See Dkt. No. 1-2. The notice is dated October 9, 2019, and the plaintiff filed this suit on October 16, 2019—well within the required ninety days.

8

environment; and (4) there is basis for employer liability." Huri, 804 F.3d at 833–34. The court infers from the plaintiff's allegations that Daniels is the same race as the plaintiff; the Seventh Circuit has held that race discrimination between members of the same race can support a Title VII claim. See Williams v. Wendler, 530 F.3d 584, 587 (7th Cir. 2008).

In Savoy v. BMW of N. Am., LLC, 313 F. Supp. 3d 907, 915–16 (N.D. Ill. 2018), the district court for the Northern District of Illinois explained that

> "To rise to the level of a hostile work environment, conduct must be sufficiently severe or [pervasive] to alter the conditions of employment such that it creates an *abusive* relationship." [*Huri*, 804 F.3d ] at 834 (emphasis in original). "In determining whether a workplace is objectively hostile," the Court must consider "the totality of the circumstances, including: the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Alamo v. Bliss*, 864 F.3d 541, 549–50 (7th Cir. 2017) (citation and internal quotation marks omitted). "The specific circumstances of the working environment and the relationship between the harassing party and the harassed also bear on whether that line is crossed." *Id.* at 550 (citation, internal quotation marks, and alteration omitted). "There is no 'magic number' of instances or type of slur that indicates a hostile work environment." *Id.* Instead, the Court looks to the "pervasiveness and severity" of language used, which are "inversely related"—a "severe episode that occurs as rarely as once and a relentless pattern of lesser harassment both may violate Title VII." *Id.* (citation and internal quotation marks omitted).

The plaintiff has stated that he was subject to unwelcome harassment from Daniels, that it was based on the plaintiff's race and that it was so severe and pervasive that it resulted in a hostile work environment. He has alleged multiple instances in which Daniels used what appears to be racist and

9

abusive language, several of which appear to reference the fact that the plaintiff is Black.

- " . . . I bet you are gonna end up going back to that bitch and live[] with her too because you are stupid. Just like every young nigga you age." Dkt. No. 10 at 2.
- "You black mother fuckers ain't gone never be shit y'all would never make it and be successful like me. I try to look out for my people and hire them but I always get fucked. They end up showing up late every day or they not productive or they just don't show up at all. But that's what happens when I give a nigga an inch and he takes a mile." Id.
- "You a pussy footing ass nigga." Id. at 3.
- "Simple ass nigga." Id.

The plaintiff alleges that he told Daniels to speak more professionally on every one of those occasions, see id. at 2, 3, showing the language was unwelcome.

The Northern District of Indiana has held that "[t]he use of the term 'nigger' by a supervisor, even if infrequently, can create an abusive work environment." Harper v. C.R. England, Inc., No. 2:08-CV-110-PRC, 2011 WL 3421490, at *5 (N.D. Ind. Aug. 3, 2011), aff'd, 687 F.3d 297 (7th Cir. 2012) (citing Rodgers v. Western–Southern Life Ins. Co., 12 F.3d 668, 675 (7th Cir.1993)). But the plaintiff has alleged more than the use of racist language. The plaintiff has alleged that after the plaintiff asked for his paycheck, Daniels was harassing and abusive to the point that the plaintiff asked to leave work.

10

Dkt. No. 10 at 3. He alleges that Daniels implied that he might physically hurt the plaintiff if the plaintiff remained at work.

There also is a basis for employer liability. The plaintiff alleges that Daniels was his supervisor. He alleges that he complained to the CEO and HR about Daniels's behavior, and they did nothing. These are both bases for supervisor liability. See <u>Montgomery v. Am. Airlines, Inc.</u>, 626 F.3d 382, 390 (7th Cir. 2010) (two bases for employer liability: "(1) that a supervisor participated in the harassment that created the hostile work environment or (2) that [the employer] was negligent in discovering or remedying harassment by his coworkers.").

The court will allow the plaintiff to proceed against Eutectic Castolin under Title VII and against Daniels under 42 U.S.C. §1981.

B.  <u>Retaliation</u>

To state a retaliation claim under Title VII, the plaintiff must "allege that [he] engaged in statutorily protected activity and was subjected to an adverse employment action as a result." <u>Carlson v. CSX Transp., Inc.</u>, 758 F.3d 819, 828 (7th Cir. 2014) (quoting <u>Luevano v. Wal-Mart Stores, Inc.</u>, 722 F.3d 1014, 1029 (7th Cir. 2013). Statutorily protected activities include complaining to superiors about conduct prohibited by Title VII or §1981. <u>Castro v. DeVry Univ., Inc.</u>, 786 F.3d 559, 564 (7th Cir. 2015).

The plaintiff alleges that he told Daniels that he would be filing a harassment suit based on Daniels' conduct. Dkt. No. 10 at 4. He alleges that the next day, Daniels called the plaintiff into his office, fired the plaintiff and

11

threatened to call the police if the plaintiff didn't get his "black ass" off the premises. Id. The plaintiff alleges that Daniels explicitly stated, "before you sue me I'm just going to fire you," id., establishing a causal link between the protected activity and the adverse employment action. The plaintiff also alleges that Daniels told the plaintiff that Daniels had connections at the EEOC and the federal courthouse, that others had sued him and failed and that the plaintiff's suit would not be successful. The plaintiff alleges that Daniels fired him because the plaintiff complained about harassment. The court will allow the plaintiff to proceed on a retaliation claim against Eutectic Castolin under Title VII and against Daniels under §1981.

C. Timing

The amended complaint does not include any dates. The plaintiff does not say when he started with the company or when he was fired. He does not give dates, or even approximate time frames, for when the events he described occurred. At the pleading stage, however, the plaintiff must state only enough facts to put the defendants on notice of the claims against them. Twombly, 550 U.S. at 555. The plaintiff's allegations put the defendants on notice that he was subjected to a hostile work environment and retaliation while he worked at Eutectic and while Daniels was his supervisor. This is sufficient to allow the plaintiff to proceed past screening.

**IV. Plaintiff's Motion for Extension of Time to Serve Original Complaint (Dkt. No. 9).**

The plaintiff filed his original complaint on October 16, 2019. Dkt. No. 1. At the same time, the plaintiff moved for leave to proceed without prepaying the

filing fee. Dkt. No. 2. While Fed. R. Civ. P. 4(m) requires a plaintiff to serve the complaint within ninety days of filing it, a motion to proceed without prepaying the filing fee pauses the clock until after the court screens the complaint. See generally Williams-Guice v. Bd. of Educ. of City of Chi., 45 F.3d 161 (7th Cir. 1995). It would have been premature for the plaintiff to serve the complaint before the court issued its February 10, 2020 screening order.

Despite this fact, on January 24, 2020, defendant Eutectic Castolin filed a motion asking the court to dismiss the complaint, citing the plaintiff's failure to serve within 90 days as required by Federal Rule of Civil Procedure 4(m). Dkt. No. 7. Two weeks later, the court issued its screening order; it denied Eutectic's motion to dismiss and gave the plaintiff a deadline of March 6, 2020 by which to file an amended complaint. Dkt. No. 8 at 4–5.

On February 18, 2020—a little over a week after the court issued the screening order—the court received from the plaintiff a letter in which he asked the court to give him an extension of time to serve the complaint. Dkt. No. 9. The plaintiff explained that he wasn't aware that he was supposed to serve the defendants within ninety days of filing the original complaint, saying if he'd known that was required he would have done it. Id. The plaintiff asked the court for more time to serve because he didn't understand the process. Id. The motion is dated February 11, 2020—the court assumes that the plaintiff had not yet received the court's screening order when he sent this letter.

The court will deny the motion as moot. The plaintiff was not required to serve the complaint on the defendants until after the court screened it. The

13

court now has screened the amended complaint and will order the U.S. Marshals Service to serve the complaint for the plaintiff.

**V.     Conclusion**

The court **DENIES AS MOOT** the plaintiff's motion to extend time to serve the defendants with the original complaint. Dkt. No. 9.

The court **ORDERS** that the plaintiff may proceed on claims of hostile work environment and retaliation against Eutectic Castolin under Title VII and against Johnny Daniels under §1981.

The court **ORDERS** the U.S. Marshals Service to serve a copy of the amended complaint and this order on defendants Eutectic Castolin and Johnny Daniels under Federal Rule of Civil Procedure 4. Congress requires the U.S. Marshals Service to charge for making or attempting such service. 28 U.S.C. §1921(a). Although Congress requires the court to order service by the U.S. Marshals Service, it has not made any provision for either the court or the U.S. Marshals Service to waive these fees. The current fee for waiver-of-service packages is $8.00 per item mailed. The full fee schedule is provided at 28 C.F.R. §§0.114(a)(2), (a)(3). The U.S. Marshals Service will give the plaintiff information on how to remit payment. The court is not involved in collection of the fee.

The court **ORDERS** defendants Eutectic Castolin and Johnny Daniels to file a responsive pleading to the amended complaint.

The court **ORDERS** that the parties may not begin discovery until the defendants have responded and the court has issued a scheduling order.

14

The court advises the parties that they should notify the court promptly of any change of address. It is the parties' responsibility to keep the court apprised of their correct addresses, so that they receive important pleadings and documents.

Dated in Milwaukee, Wisconsin this 29th day of September, 2020.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**